IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNIVERSAL PLANT SERVICES OF NASHVILLE, INC. | * | |
| | * | Civil No. TJS-21-1188 |
| v. | * | |
| BOLAND TRANE SERVICES, INC. | * | |

\*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

When a party to a contract breaches its obligations, it must pay for damages proximately caused by its breach. It is not required to pay for other damages. In this case, Universal Plant Services of Nashville, Inc. ("Universal") contracted with Defendant Boland Trane Services, Inc. ("Boland") to remove, repair, and reinstall a machine. Universal breached the contract by failing to align the machine with other equipment. Because Universal breached, Boland is not required to pay for Universal's work. At the same time, Universal does not have to pay for Boland's damages because they were not caused by Universal's breach. Instead, they were caused by Boland's decision to run the machine out of alignment. And Boland cannot recover for negligence because Universal's only duties to it were those written in the contract. For the reasons explained below, neither party recovers anything.

## I.     Introduction

By the stipulation of the parties, the Court conducted a three-day bench trial on February 26-28, 2024.[1]

---

[1] This case is assigned to me for all proceedings, by the consent of the parties, pursuant to 28 U.S.C. § 636(c). ECF Nos. 31, 33 & 34.

Under Rule 52 of the Federal Rules of Civil Procedure, the Court must make specific findings of fact and state conclusions of law separately in any action tried without a jury. In doing so, the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate witness credibility of, weigh the evidence, and choose among conflicting inferences and conclusions. In doing so, and to comply with this rule, the Court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten v. Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment). Rule 52(a) "does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (quoting *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1952)).

Based on an evaluation of all of the evidence, including the parties' exhibits, the testimony of the witnesses, the inferences to be drawn from the evidence, and the parties' arguments, I make the following findings of fact and conclusions of law:

## II.    Findings of Fact

1.      Some buildings on the campus of the University of Maryland, College Park are cooled by the University of Maryland Chiller System ("chiller"). In 2019, Engie-College Park Energy, LLC ("Engie"), the company that monitors and maintains certain cooling and energy systems for the University of Maryland, decided to overhaul the chiller. Engie is not a party to this case.

2.      The chiller is composed of a Murray Model KD7 multi-stage steam-driven turbine and a York compressor. The two components are connected by a coupling, which allows the energy

generated by the rotation of the turbine to power the compressor. When the compressor is powered, it compresses refrigerant from a lower pressure to a higher pressure. This allows chilled water to be supplied to fan coil units and air handlers, cooling the air in connected buildings. If the chiller fails, buildings relying on it for climate control will lose cooling capacity. In hot weather, buildings without air conditioning can be uncomfortable.

3.      Boland is a sophisticated commercial HVAC contractor with expertise in large air conditioning equipment. Its customers include municipalities, school systems, government entities, hospitals, hotels, and other buildings with chillers or large air conditioning equipment. It has been in business since 1960. It hires steamfitters from the local steamfitters union, which requires that steamfitters undergo a five-year apprenticeship program.

4.      Boland entered into a contract with Engie for the overhaul of the chiller at the University of Maryland. Under its contract, Boland agreed to overhaul the chiller's turbine and compressor, and Engie agree to pay Boland for the work. Boland handled the work on the compressor itself and subcontracted the overhaul of the turbine to Universal.

5.      Under its contract with Boland, Universal agreed to a scope of work that included:

- performing an "as-found coupling alignment check" of the chiller's turbine;

- disassembling the turbine and removing its upper half for refurbishment;

- reassembling the turbine after refurbishment;

- reinstalling the refurbished turbine;

- checking the alignment of the turbine and compressor after reinstallation;

- aligning the turbine to the compressor after reinstallation; and

- standing by to support Boland and Engie when the turbine was first started after reinstallation.

6.      Boland agreed to pay Universal for its work. The cost for Universal's work was between $171,733 and $184,468.70.

7.      At the end of each day of work, Universal summarized the work it performed in a daily field report. The daily field report is a simple, one-page report that would be displayed for and signed by a Boland representative on an iPad. In some instances, daily field reports identify only the persons who performed work and do not describe the work performed.

8.      At all relevant times, Brad Elkins was Universal's foreman on the Boland job. He was responsible for preparing the daily field reports. Elkins has over 20 years of experience as a millwright. For Boland, steamfitter Casey Emory was the prime mechanic on the job site. Emory was the person generally tasked with making decisions for Boland.

9.      While the chiller was being serviced, it was "locked out" and "tagged out." In practical terms, this meant that Boland, Universal, and Engie each placed a lock on the chiller so that it could not be operated. The chiller could be started only if all three locks were removed.

10.      On February 10, 2020, Universal personnel arrived onsite at the University of Maryland to disassemble the turbine. Before disassembly, Universal performed an "as-found coupling alignment check" to determine the respective positions of the turbine and compressor. Universal found that the turbine and compressor were out of alignment on both the vertical and horizontal planes. It informed Boland that the turbine and compressor were misaligned. This misalignment was likely due to the internal components wearing down over time.

11.      Universal disassembled the turbine, removed the upper half of the case, and left the lower half of the case undisturbed. It shipped the turbine to BWC, a machine shop in Pennsylvania, so that BWC could perform rotor repairs on the turbine. Universal rebuilt the turbine's governor valve, which regulates the steam entering into the turbine.

4

12.     BWC took longer than expected to complete its work on the turbine. On June 22, 2020, Universal delivered the refurbished turbine to the University of Maryland and reinstalled it over several days.

13.     Upon reinstalling the turbine, Universal performed a coupling alignment check. The result of the check indicated that the turbine and compressor were out of alignment, and to a more drastic degree than in February 2020. The misalignment did not comply with the manufacturer's manual specifications.

14.     On June 26, 2024, a meeting was held to discuss the misalignment of the turbine and compressor. Present during the meeting were Casey Emory, Guy Hay, and Mike Miller (of Boland); Brad Elkins (of Universal); and a representative from Engie named Mike. Phil Riggs, the manager for Engie, was not working on the day of the meeting.

15.     Elkins showed Boland reports from its laser alignment tool, which displayed red frowning faces, meaning that the turbine and compressor were out of alignment. Universal did not provide any written analysis that compared the alignment to manufacturer specifications. And it provided nothing in writing that warned Boland about potential dangers of operating the chiller out of alignment.

16.     Emory told Elkins that he "want[ed] the turbine aligned before we started." Elkins responded that it would "take a lot of time" to align the turbine to the compressor. Neither Elkins nor any other representative of Universal told Emory or Boland that it was acceptable to run the chiller out of alignment, and Universal did not try to persuade Emory or Boland to run the chiller out of alignment.

17.     In a chiller of the type at issue in this case, running a turbine out of alignment with its compressor can cause fatal damage to both the turbine and compressor. The turbine rotates at a

rate of between 3500 to 4500 revolutions per minute. Because of the exact tolerances required for operation at this speed, even slight a misalignment can cause major damage.

18.     Universal did not align the turbine to the compressor, as the contract with Boland required. By failing to align the turbine to the compressor, Universal materially breached the contract.

19.     Emory knew better than to run the chiller out of alignment: he "told everybody that [he] would not run the turbine" or the chiller until it was aligned. Having worked on thousands of chillers during his career, Emory knew that if the chiller was run out of alignment, "there would be consequences" and "bad things could happen." But Boland went against Emory's advice. As documented in a field report prepared by Universal on June 26, 2020, the same day as the meeting, Boland decided "to go" with the misalignment and operate the chiller out of alignment.

20.     In June and July 2020, the weather in College Park, Maryland was hot and humid. Although many students were away on summer break, they were due to return in August 2020 for the fall semester. Without air conditioning, buildings on the University of Maryland campus would have been uncomfortably hot and humid. Throughout this time, Boland was "under the gun." Engie put significant pressure on Boland—every day—to get the chiller up and running. Boland's business tagline is "We're not comfortable unless you are."

21.     On June 26, 2020, Boland decided to start the chiller even though the turbine and compressor were out of alignment. Under its contract with Universal, Boland retained responsibility for "technical direction." As such, Boland had the authority to decide to run the chiller out of alignment. Before starting it up, and at Boland's direction, Universal, Boland, and Engie removed their respective locks from the equipment. Emory and Engie's representatives started the chiller, with Emory manning the control panels on the chiller and Engie opening the

steam valve and starting the unit. Other than removing its lock as Boland directed, Universal had no role in starting up the chiller after the turbine was reinstalled.

22.     Elkins remained on site during the initial start-up. When the chiller began running, there were "governor valve issues." These issues caused a problem with the turbine's throttle and the flow of steam. Universal fixed the governor valve issues soon after the July 4, 2020, holiday. Once the governor valve was repaired, on July 6 or 7, 2020, Boland started the machine again. This time, Emory was on vacation, so Mike Miller from Boland worked with Engie to start the machine. Miller documented his work in a service ticket dated July 6, 2020. Universal had no role in starting the chiller on this date.

23.     On July 7, 2020, Miller called Emory to tell him that there was a problem with the chiller. Because the turbine and compressor were misaligned, the chiller experienced a catastrophic failure, damaging the newly-refurbished turbine and chiller. The damage was solely caused by Boland and Engie starting the chiller when it was out of alignment.

24.     I credit the testimony of Elkins and discredit the testimony of Emory on the following issues, where their testimony was inconsistent: who decided to start the chiller when the turbine and compressor were out of alignment, whether Boland understood the risks of operating the chiller when the turbine and compressor were out of alignment, and who started the chiller in June and July 2020. Elkins' demeanor, body language, and tone indicated that he retained an accurate memory of the events in question, and that he was telling the truth. I cannot make the same finding for Emory. I find that Elkins' testimony was internally consistent and supported by evidence created at the same time as the events in question. On several points, Emory's testimony contradicted this other evidence. I also find that Elkins' version of events is consistent with Boland being pressured by Engie to start the chiller as soon as possible, which Emory corroborated. I do

not credit the testimony of Guy Hay, except to the extent that it is consistent with the testimony of Elkins. Hay appeared uncomfortable and uncertain during his testimony. He evinced a limited recall of the events at issue, and his testimony was at times inconsistent with evidence generated from June and July 2020, as well as testimony from more credible witnesses.

25.     After the July 2020 chiller failure, and at significant expense, Boland rebuilt the compressor a second time. It hired Siemens, the turbine's manufacturer, to rebuild the turbine. Siemens completed the refurbishment of the turbine and reinstalled it in proper alignment with the compressor. The chiller came back into operation in early 2021. Boland claims the cost to repair the equipment exceeded $867,228, including a markup for labor and other costs.

26.     Boland demanded that Universal pay for the damages caused by running the chiller out of alignment, but Universal refused. And Boland refused to pay Universal for the work it performed on the turbine. This lawsuit followed.

## III.   Conclusions of Law

### A.   Maryland Law Applies

Because this case is before the Court on the basis of diversity, the Court applies the substantive law and choice of law rules of the state in which it sits. *See State Farm Fire & Cas. Co. v. Huguely*, 432 F. Supp. 3d 587, 591 (D. Md. 2020) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). "In contract claims, Maryland applies the doctrine of *lex loci contractus*, meaning the law of the place where the contract was made applies." *Huguely*, 432 F. Supp. 3d at 591 (citing *Allstate Ins. v. Hart*, 327 Md. 526, 529 (1992). "The *locus contractus* is the place where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. v. Van Buskirk*, 241 Md. 58, 65-66 (1965). Because the contract between Universal and Boland was made in Maryland, Maryland's substantive law applies to the parties' breach of contract claims.

Maryland law also applies to Boland's negligence claim. Maryland adheres to the *lex loci delicti* rule to determine the applicable law in tort actions. *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 744 (2000). Under this rule, the "substantive tort law of the state where the wrong occurs governs." *Hauch v. Connor*, 295 Md. 120, 123 (1983). Because Boland's claim is premised on events that occurred in Maryland, Maryland law applies.[2]

## B.      The Parties' Breach of Contract Claims

Universal claims that Boland breached the contract by failing to pay for Universal's work. It demands that Boland pay for the work that it completed, plus prejudgment interest and reasonable attorney's fees. Conversely, Boland claims that Universal breached the contract by failing to align the turbine upon reinstallation, and demands that Universal pay for the damages it incurred in the repair and reinstallation of the turbine and compressor. As explained below, Universal breached its contract with Boland, but Boland has failed to prove the damages that it incurred.

### 1.      Breach of Contract

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). When interpreting contracts, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Bd. of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380 (1977). A contracting party is not

---

[2] The parties agree that Maryland law applies to their claims.

bound merely by the assumptions or beliefs of the other contracting party, but is instead bound by the contract itself. *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179 (1972).

"A breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *St. Paul Fire & Marine Ins. v. House*, 315 Md. 328, 355 (1989). A material breach of a contract by one party excuses the other party from performance. *Whiting-Turner Contr. Co. v. Capstone Dev. Corp.*, WDQ-12-3730, 2013 WL 5423953, at *8 (D. Md. Sept. 26, 2013); *Final Analysis Commc'n Servs., Inc. v. Gen, Dynamics Corp.*, 253 F. App'x 307, 313 (4th Cir. 2007) ("It is well established that a material breach by one party to a contract excuses the other party from performance."). "A breach is material 'if it affects the purpose of the contract in an important or vital way.'" *Id.* (quoting *Barufaldi v. Ocean City, Chamber of Com., Inc.*, 196 Md. App. 1, 23 (2010)).

### 2.     Context in Contract Interpretation

Maryland follows the objective theory of contract interpretation. *Tapestry, Inc. v. Factory Mut. Ins.,* 482 Md. 223, 239 (2022). Unless the language of the contract is ambiguous, it will be interpreted "based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation." *Id.* (quoting *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (internal quotation marks omitted).

Still, the language of a contract is not interpreted "in a vacuum." *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 42 (2011). Contracts are instead interpreted "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." *Credible Behav. Health*, 466 Md. at 394 (internal quotation marks omitted) (quoting *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 88

(2010)). Considering the context of a contract "may necessarily require consultation of evidence beyond the 'four corners' of the contract itself, [but] it does not extend to extrinsic or parol evidence of the parties' subjective intent, such as evidence of the parties' negotiations." *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, No. 31, September Term, 2023, 2024 WL 3407452, at *5 (Md. July 15, 2024) (citing *Impac Mortg. Holdings, Inc.*, 474 Md. at 534 n.32). Extrinsic or parol evidence may be considered only after a court finds that the relevant contract language is ambiguous. *Id.* A contract provision is ambiguous when, after conducting the plain-language inquiry, a "reasonably prudent person could ascribe more than one reasonable meaning to it." *Credible Behav. Health*, 466 Md. at 394. To interpret the plain language of a contract in context, the Court will attempt to construe the contract as a whole, interpreting separate provisions in harmony so that all may be given effect. *Id.* at 396. In all events, the Court will "strive to interpret contracts in accordance with common sense." *Id.* (quoting *Brethren Mut. Ins. v. Buckley*, 437 Md. 332, 348 (2014)).

### 3.     Universal's Material Breach Excuses Boland's Nonperformance.

Context makes clear that the contract between Universal and Boland required Universal to align the turbine to the compressor. The contract spells out a list of tasks that Universal needed to complete, and it organizes them in chronological order. Among other things, Universal agreed to perform an "as-found coupling alignment check" before disassembling and removing the portion of the turbine to be overhauled, to perform another coupling alignment check when the turbine was reinstalled, to make up the coupling between the turbine and compressor, and to stand by and offer support when the unit was first started up. By requiring Universal to check the coupling alignment upon reinstallation, then to make up the coupling, and then to stand by for the unit to be started, the contract unambiguously required Universal to align the turbine to the compressor.

11

Reading the contract any other way would be inconsistent with its essential purpose: for Boland to obtain a refurbished, operable turbine to power the chiller's compressor. A misaligned turbine will not power a compressor, at least not for long. Considering the context in which the contract was made, a reasonably prudent person in the parties' position would have interpreted it to require the alignment of the turbine and compressor.

When Universal reinstalled the turbine, it performed a coupling alignment check and made up the coupling, as required by the contract. But upon finding that the turbine was out of alignment, it failed to align it to the compressor, which was also required by the contract. In its failure, Universal materially breached the contract. The purpose of Boland's contract with Engie was to refurbish the chiller system so that it would continue to operate in the future. And the purpose of Boland's contract with Universal was to the same end: to refurbish the turbine so that it would power the compressor. When Universal reinstalled the turbine out of alignment with the compressor and then failed to properly align the two machines, it frustrated the essential purpose of what it agreed to do. Boland contracted with Universal to obtain a refurbished and operable turbine, not a turbine that was so misaligned that its operation posed the risk of catastrophic failure. That Boland bore the responsibility for technical direction under the contract does not excuse Universal's failure to align the turbine. The contract required Universal to align the turbine and it failed to do so.[3]

---

[3] The contract also required that Universal "issue dispositions of all findings and inspections." If the findings deviated "from OEM standards, specifications, or standard practices," Universal was required to request authorization from Boland before completing additional work. The Court does not find that Universal breached the contract by failing to produce written document to Boland. Contrary to Boland's argument, the contract did not require Universal to issue *written* dispositions of its findings and inspections. Universal complied with this part of the contract when it disclosed to Boland that the turbine and compressor were out of alignment, when it showed Boland the red frowning faces on its laser inspection tool, and when it discussed the matter with Boland and Engie at the June 26, 2020, meeting.

Because Universal materially breached its contract with Boland, Boland is excused of its obligation to pay Universal for work performed under the contract. Judgment on Universal's breach of contract claim will be entered for Boland.

### C.    Boland Has Not Proven Damages Caused By Universal's Breach.

As a preliminary matter, I accept all of the parties' proffered expert witnesses (Lisa Lallo, John Green, and George Saunders) as experts in their fields. But I am not persuaded by Dr. Lallo's opinion that misalignment was not the sole root cause of the failure of the chiller. Instead, I credit the opinion of Mr. Saunders that misalignment was the sole cause of the chiller's failure. Mr. Saunders is better qualified at judging the failure of turbines and compressors, and gave more convincing testimony. I make no finding on the opinion of Mr. Green as to the standard of care that Universal owed to Boland because, as explained in this opinion, the existence of a legal duty in the first place is a question of law that I have resolved against Boland. But I am persuaded by Mr. Green's opinion that, in general, misalignment of a turbine and compressor can lead to machine failure, as happened here.

At the moment Universal reinstalled the turbine and determined that it was out of alignment, Boland was entitled to have the turbine properly realigned. Under its contract with Universal, Boland could have insisted that Universal realign the turbine without additional payment. If Universal refused, Boland could have pursued several remedies. It could have sued Universal and sought an order requiring Universal to align the turbine. It could have attempted to align the turbine itself. Or, more practically, Boland could have found another contractor to align the turbine, and then charged its costs to Universal. If Universal refused to pay, Boland could have sued to recover damages for Universal's breach of contract. Its damages would have been easy to prove. *See Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 685 (D. Md. 1998)

(explaining that the measure of damages for breach of contract is "the sum which would place the injured party in the same position as if the contract had been performed").

But Boland did not insist that Universal align the turbine, and it did not take steps to align the turbine before it was started. As the technical director of the project, Boland had the authority to decide whether to operate the unit out of alignment. Acting within its rights, Boland—not Universal—decided to start the chiller, and it experienced a catastrophic failure. The failure was not caused by Universal's misalignment of the turbine but by Boland's *running* the chiller out of alignment. The damages that Boland proved at trial all relate to the damage the turbine and compressor incurred from being run out of alignment. These damages were not caused by Universal; they were caused by Boland.

Before Boland started the chiller, its damages would have been limited to what it would cost to align the turbine to the compressor, and those damages would have been chargeable to Universal. But Boland has not proven any such damages. Instead, it claims damages that arose only when it started the chiller out of alignment. While these damages are related to Universal's failure to align the equipment, they were not proximately caused by that failure. *See generally Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594 (2007) (explaining that breach of contract damages are limited to those that are proximately caused by the breaching party) (citing *Impala Platinum, Ltd. v. Impala Sales, Inc.*, 283 Md. 296, 330 (1978)); *see also Ringdahl v. Afsharjavan*, No. PX-18-1006, 2019 WL 5390853, at *4 (D. Md. Oct. 22, 2019) (citing *Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 342 (1993); *Beard v. S/E Joint Venture*, 321 Md. 126 (1990)). Boland's operation of the equipment out of alignment was an intervening act in the chain of events that led to the failure of the chiller. This broke the chain of causation between Universal's breach

14

of contract and the damages that Boland incurred. Boland's damages are directly attributable to it running the chiller out of alignment. They were not caused by Universal.

Because Boland has not proven damages caused by Universal's breach of contract, Boland is not entitled to any damages. Judgment on Boland's counterclaim for breach of contract will be entered for Universal.

### D.     Boland's Negligence Claim

Boland alleges that Universal breached a duty it owed to Boland and is thus liable for negligence. To prevail on a claim of negligence in Maryland, a plaintiff must prove the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999) (internal quotation marks omitted). Absent a duty of care, a defendant cannot be liable for negligence. *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 532 (1986).

A duty of care is "an obligation to which the law will give effect and recognition to confirm to a particular standard of conduct toward another." *Id.* (citation omitted). Contractual obligations, by themselves, do not create tort duties. *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 253 (1999). "Instead, the duty giving rise to a tort action must have some independent basis." *Id.* Absent a duty arising independent of contractual obligations, the "mere negligent breach of a contract . . . is not enough to sustain an action sounding in tort." *Id.* (quoting *Heckrotte v. Riddle*, 224 Md. 591, 595-96 (1961)).

Whether a duty exists is question of law. *Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 414 (2005). But there is no "set formula" for determining when a duty exists. *Id.* at 415. In essence,

determining whether a duty exists "represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell v. Littlepage*, 413 Md. 96, 120 (2010). Courts often frame this issue as whether a sufficiently intimate nexus existed between the parties to impose a tort duty. *See, e.g.*, *OceanFirst Bank N.A. v. Brink's, Inc.*, No. DLB-21-3275, 2022 WL 4465897 (D. Md. Sept. 26, 2022). Contractual privity, by itself, does not create an intimate nexus to impose a tort duty. *Id.*

Courts have considered a variety of factors to determine whether an actionable duty exists. *Doe v. Maryland*, No. ELH-20-1227, 2021 WL 1174707, at *35 (D. Md. Mar. 29, 2021) (citing *Pendleton v. State*, 398 Md. 447, 461-62 (2007)). In general, a duty of care exists in the context of "contractual dealings with professionals such as physicians, attorneys, architects, and public accountants." *Jacques*, 307 Md. 541. Maryland's Supreme Court has also extended this duty of care to banks processing consumer loan applications, *id.* at 542-43 (explaining that imposing a duty of care under the circumstances aligned with state policy because banks are "affected with the public interest," and that a duty of care is "reasonable in light of the nature of the banking industry and its relation to public welfare"); *see also Spaulding v. Wells Fargo Bank, N.A.*, 920 F. Supp. 2d 614, 620 (D. Md. 2012) (explaining that *Jacques* "took painstaking care to carve out a narrow exception to the general rule that Maryland does not recognize negligence actions that arise solely out of a contractual relationship"), and abstracting companies performing title searches, *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197 (2013) (finding that a title company owed a duty to conduct title searches with reasonable care). *But see Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 626 (2017) (declining to find an independent duty for architects in the context of public construction projects because parties to such projects "have sufficient opportunity to protect themselves (and anticipate their liability) in

16

negotiating [the] contracts" and because imposing a duty on such professionals would "likely correlate with an increase in project costs . . . and a corresponding rise in price for government entities").

Cases where courts have found an independent duty of care have one of two things in common: parties thought to be "vulnerable" and in need of protection or instances when the public at large would be protected by imposing a duty. The Fourth Circuit discussed this principle in *Laws. Title Ins. v. Rex Title Corp.*, 282 F.3d 292, 294 (4th Cir. 2002) (explaining that while "Maryland does not recognize a cause of action for negligence arising solely from a contractual relationship between two parties," it has "approved a few narrow exceptions to this general rule, one of which permits negligence claims arising from a contractual relationship in circumstances involving a vulnerable party"); *see also Nat. Prods. Sols., LLC v. Vitaquest Int'l, Inc.*, No. CCB-13-436, 2014 WL 6383482, at *9 (D. Md. Nov. 13, 2014) ("Maryland courts have recognized such an independent duty exists in various contexts, including those involving vulnerable parties, professional occupations, and principal-agent relationships.").

These exceptions to the general rule are not "available in litigation between '[e]qually sophisticated parties.'" *Id.* (citing *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (citation omitted)). When claimed losses are "purely economic and the parties engaged in arms-length commercial bargaining," courts applying Maryland law have steadfastly limited the remedies to those available in contract law. *OceanFirst*, 2022 WL 4465897, at *3. This is because there is a "fundamental distinction between claims in tort and claims in contract—contract duties are those specifically agreed upon by the parties, while tort duties are those imposed by the state for the purpose of protecting a vulnerable party." *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org. (INTELSAT)*, 763 F. Supp. 1327, 1331 (D. Md. 1991),

17

*aff'd in part, rev'd in part sub nom. Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94 (4th Cir. 1992).

Of course, being a party to a contract does not relieve one of complying with tort duties arising independent of the contract, even if no "vulnerable party" is involved. *Id.* ("[W]hen an independent duty accompanies a contractual obligation, that independent duty may give rise to a tort action.") (citing *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 741 (1999)). An insurance agent, for example, "owes precisely such an independent duty to his principal, the insurance company, and so the insurer can sue the agent not only for breach of contract, but also negligent breach of that independent duty." *Id.* (citations omitted). But there must be a basis for a court to impose a tort duty on a defendant.

Judges in this district have routinely rejected negligence claims arising from breaches of contract. *See, e.g.*, *Chevron U.S.A. Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 823 (D. Md. 2015) (dismissing negligence claim because the parties' dispute was one of contract that arose from a straightforward buyer-seller relationship between sophisticated parties in positions of equal bargaining strength) (internal quotation marks omitted); *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666 (D. Md. 2013) (finding that the alleged nexus between commercial entities was "insufficiently intimate to warrant the imposition of a tort duty" and dismissing the plaintiff's negligent misrepresentation and fraudulent concealment claims); *W.R. Grace & Ci.-Conn. v. Wood Env't & Infrastructure Sols., Inc.*, No. GLR-22-285, 2023 WL 9900961, at *6 (D. Md. Apr. 17, 2023) ("[B]ecause Maryland generally does not recognize a tort claim arising solely from a contractual relationship between two parties, and neither exception to this general rule appl[ies] here, Grace's gross negligence claim fails."); *OceanFirst*, 2022 WL 4465897, at *5 (concluding that the plaintiff did not plausibly allege the requisite intimate nexus between the

parties—sophisticated commercial entities with equal bargaining strength—to impose a tort duty);

*Plum House IV, Inc. v. Wells Fargo Merch. Services, LLC*, No. CCB-15-2294, 2016 WL 337492,

at \*4 (D. Md. Jan 28, 2016) (explaining that the "particular circumstances that justified finding a

special relationship between the parties in *Jacques*" were absent because the parties were

"commercial enterprises that engaged in an arms'-length transaction" that did not affect the public

interest, and there was "no evidence to suggest a disparity in the strength of either party's

bargaining position, or that one party was more sophisticated than the other"); *Vitaquest*, 2014 WL

6383482, at \*9 (deciding that no independent tort duty existed in a "vanilla manufacturing

relationship between sophisticated parties in positions of equal bargaining strength"); *see also*

*Martin Marietta*, 991 F.2d at 98 (affirming district court's dismissal of negligence claims because

the parties' relationship was governed by contract and the plaintiff was not an "unsophisticated

consumer, unfamiliar with the subject matter of the contract," who relied one someone the way

that a person might rely on a physician, attorney, architect, or public accountant).

       **1.    Universal Did Not Owe a Duty to Boland Arising Independent of Contract.**

Universal did not owe a tort duty to Boland. Universal and Boland are sophisticated,

commercial entities. Their relationship was governed by a run-of-the-mill contract, which they

negotiated at arm's length and with equal bargaining strength. Nothing in this case is analogous to

the unique contexts where courts applying Maryland law have found a tort duty existed

independent of the contract. Boland is not a "peculiarly vulnerable party," like the patient placing

their trust in a doctor for their care or in an attorney for legal advice. And it is not an unsophisticated

consumer of services that relied solely on the representations of Universal. To the contrary, Boland

is an *expert* in large air conditioning equipment like the chiller in this case.

If Boland wished for Universal to be bound by certain duties in performing its contract, it could have negotiated for the inclusion of such provisions in the contract.[4] But it did not do so, and the Court does not find that any clause in the contract required Universal to exercise reasonable care. Recognizing a tort duty here would erase "the fundamental distinction between claims in tort and claims in contract." *Martin Marietta Corp.*, 763 F. Supp. at 1331.

Because Universal and Boland lack the "intimate nexus" required for the Court to find that Universal owed an independent duty to Boland in tort, Boland cannot prevail on its negligence claim. Without a duty, there can be no breach of that duty, and thus no recovery for negligence. Judgment will be entered in favor of Universal on the Boland's negligence claim.

### 2. Even If Universal Was Negligent, Boland Was Contributorily Negligent.

Even assuming that Universal owed a duty of care in fulfilling its obligations under the contract, Boland's contributory negligence bars its recovery. In Maryland, contributory negligence is an affirmative defense that, if proved, is a complete bar to a plaintiff's recovery. *Schroyer v. McNeal*, 323 Md. 275, 280 (1991); *Hawkins v. Barakat*, No. ELH-20-1386, 2022 WL 94966, at *3-4 (D. Md. Jan. 10, 2022) (citing *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690 (2013)).

"Contributory negligence is the neglect of the duty imposed upon all [persons] to observe ordinary care for their own safety." *Campfield v. Crowther*, 252 Md. 88, 93 (1969). It is "the doing of, or omitting to do, some act or thing which a reasonably careful person would not have done or omitted to do under the circumstances, and which . . . thereby becomes the . . . proximate cause of

---

[4] Of course, the contract *did* require Universal to align the turbine to the compressor, and Boland agrees that Universal breached this part of the contract. It is not clear how the inclusion of additional duties in the contract would have resulted in a different outcome. In any event, Boland did not negotiate for the inclusion of such contract terms.

the injury." *Miller v. Michalek*, 13 Md. App. 16, 19 (1971) (citation omitted). "The focus of the contributory negligence defense is whether the plaintiff took appropriate precautions to protect his own interests." *Wegad v. Howard St. Jewelers, Inc.*, 326 Md. 409, 417 (1992).

Boland knew that aligning the turbine to the compressor was important because running the chiller out of alignment could cause damage. And it knew that Universal had not aligned the turbine and compressor. Boland was informed by its most experienced team member, Casey Emory, that it was inadvisable to run the chiller out of alignment. Still, Boland chose to run the chiller out of alignment. In doing so, Boland did not act with the reasonable care that would be expected under the circumstances, and instead acted negligently. Boland's negligence was a proximate cause of the chiller's failure and its resulting damages. Boland bent to Engie's pressure to get the chiller up and running, when it should have exercised caution and insisted that the turbine and compressor be aligned before the machine was started. Even assuming that Universal was negligent, Boland was contributorily negligent and is thus barred from recovery in tort.

Boland's contributory negligence is not excused by the last clear chance doctrine. The last clear chance doctrine allows a contributorily negligent plaintiff to recover damages from a negligent defendant if: (1) the defendant is negligent; (2) the plaintiff is contributorily negligent; and (3) the plaintiff makes a showing of something new or sequential, which affords the defendant a fresh opportunity, of which he fails to avail himself, to avert the consequences of the original negligence. *Major v. CSX Transp.*, 278 F. Supp. 2d 597, 618 n.4 (D. Md. 2003) (citing *Burdette v. Rockville Crane Rental, Inc.*, 130 Md. App. 193, 216 (2000)). The doctrine applies only "when the defendant's negligence in not avoiding the consequences of the plaintiff's negligence is the *last* negligent act; and, cannot be invoked when plaintiff's own act is the final negligence act, or is

*concurrent* with defendant's negligence." *Meldrum v. Kellam Distrib. Co.*, 211 Md. 504, 512 (1957) (emphasis in original).

Because Boland was responsible for technical direction under the contract, it had the authority to start the chiller even though it was out of alignment. When it negligently did so, on June 26 and July 6-7, 2020, it did not afford Universal a "fresh opportunity" to avert the consequences of Boland's negligence. *See Major*, 278 F. Supp. 2d at 618 n.4 (explaining that a party's action cannot be both the original act of negligence and the opportunity to avert the accident under the last clear chance doctrine); *see also Janson v. Reithoffer Shows, Inc.*, No. DLB-19-79, 2021 WL 5280894, at *6 (D. Md. Nov. 12, 2021). The last clear chance doctrine does not save Boland's ability to recover.

### 3.     Even if Universal Was Negligent, Boland Assumed the Risk.

Boland also assumed the risk of starting the chiller when it was out of alignment, so its recovery against Universal is barred even if Universal was negligent. Assumption of the risk "serves as a complete bar to a plaintiff's recovery." *Crews v. Hollenbach*, 358 Md. 627, 640 (2000) (explaining that "a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk"). "To establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 348 Md. 84, 90-91 (1997). Universal has established that Boland assumed the risk.

As explained above, Boland was well aware of the danger of operating the chiller while the turbine and compressor were out of alignment. Casey Emory, its shop steward and lead mechanic on the job, told it so. Boland attended a meeting where the alignment issue was

discussed. It appreciated the risk of running the chiller out of alignment. There is no requirement that Boland understand each possible mechanism by which the chiller might fail if operated out of alignment. Even the experts who testified at the trial disagreed about that. All that is required is for Boland to have understood the essence of the risk it was assuming. Boland had a sufficient appreciation of the risk it undertook in operating the chiller out of alignment. It is a sophisticated entity with expertise in large air conditioning equipment. Its on-site representatives in June and July 2020 were experienced mechanics. Boland knew that operating the chiller out of alignment might cause damage, and it chose to do so anyway, probably to appease Engie's demands that the unit be put back into operation as soon as possible. Because Boland assumed the risk that the chiller would fail when operated out of alignment, it cannot recover against Universal for negligence.

## IV.     Conclusion

For these reasons, judgment will be entered in favor of Boland on Universal's breach of contract claim, and in favor of Universal on Boland's counterclaims for breach of contract and negligence. Neither party is awarded any damages, and both parties will cover their own costs of litigation. A separate order follows.


Date:   August 6, 2024                              _____/s/_____
                                                    Timothy J. Sullivan
                                                    Chief United States Magistrate Judge